UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RUSTY A. RAY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| v. ) | CASE NO. 1:04-cv-0780-DFH-VSS |
| ) | |
| JO ANNE B. BARNHART, Commissioner ) | |
| of the Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Rusty Ray seeks judicial review of a final decision by the Commissioner of Social Security denying his application for disability insurance benefits and supplemental security income benefits. Acting for the Commissioner, an Administrative Law Judge ("ALJ") determined that Mr. Ray was not disabled under the Social Security Act. Mr. Ray contends that the ALJ erred by not finding that his depression was a "severe impairment," by not giving proper weight to his treating physician's opinion, and in assessing his credibility and residual functional capacity. As explained below, the ALJ's decision is supported by substantial evidence and is affirmed.

*Background*

Rusty A. Ray was initially denied Social Security benefits in August 20, 2002. R. 45. The Appeals Council vacated the decision and remanded the case

because the ALJ had failed to address Mr. Ray's possible narcolepsy and had failed to give a rationale for his residual functional capacity assessment, which differed from that of the State agency physicians. R. 33-34. On November 20, 2003, the ALJ again denied benefits.

At that time, Mr. Ray was 42 years old. He has an eighth-grade education, has earned a high school general equivalency diploma, and has worked as a saw operator, press operator, and heavy equipment operator. R. 13, 98, 156. Throughout the period at issue, Mr. Ray was the primary caretaker of his two adolescent children. R. 277-78. Mr. Ray suffers from hypertension, obstructive sleep apnea syndrome, depression, obesity, and possible narcolepsy. R. 22, 64, 100, 215. Mr. Ray claims that his combined psychological and physical impairments have rendered him disabled since July 1, 2000.

After his divorce in 1998, Mr. Ray was treated at Wabash Valley Hospital for major depression and alcohol dependance. R. 158-161. Other than his depression and alcohol dependence, Mr. Ray was in general good health at the time he was admitted. R. 161-62. In June 1999, Mr. Ray was diagnosed with obstructive sleep apnea and was advised to be cautious driving and operating dangerous machinery. R. 151-52. Mr. Ray also claims he was diagnosed with narcolepsy several years before the termination of his work as a fork lift operator in April 2000. R. 156, 208.

Mr. Ray applied for Social Security benefits on October 30, 2000, claiming disability since July 1, 2000.  R. 12-13.  Also in October 2000, Mr. Ray sought treatment at a neighborhood clinic for his depression and sleeping problems.  A registered nurse, Ms. Kelly, recommended that Mr. Ray stop taking Ephedrine, lose weight, and stop smoking.  R. 120.

At the request of the state disability determination agency, Dr. Bangura examined Mr. Ray in January 2001 and found that he had a normal gait and station, could squat and rise without difficulty, and had normal neurological and cardiac examinations and normal fine finger movements.  R. 146-48.  Mr. Ray informed Dr. Bangura that he had recently used Ephedrine pills in large quantities but had stopped taking them in July 2000 because Ephedrine caused heart palpitations and increased heart rate.  R. 146.  Mr. Ray also reported worsening fatigue and sleepiness, at times sleeping two to three days without any difficulty.  *Id.*  Dr. Bangura's impressions included severe obstructive sleep apnea syndrome, morbid obesity with obesity-hypoventilation syndrome, poorly controlled hypertension, and tobacco use.  R. 149.

In May 2001, Mr. Ray began to see a social worker for counseling.  Mr. Ray was prescribed Prozac for depression, but he denied any mood improvement.  R. 183.  In May 2001, at the request of the state disability agency, clinical psychologist Dr. Jarmon examined Mr. Ray and observed that he could respond coherently, repeat digits, and complete simple calculations.  R. 99.  Dr. Jarmon

diagnosed Mr. Ray with "depressive disorder" and assigned him a GAF rating of 60-65.[1]  R. 100.  Dr. Jarmon noted that if Mr. Ray were granted benefits, he could manage his own finances.  *Id.*

Mr. Ray's sleepiness improved with the use of Adderall, an addictive stimulant.  In August 2001, Mr. Ray began to take six 20 mg tablets per day of Adderall, and it "changed his life."  R. 216.  In November 2001, Mr. Ray reported he could function and sleep well by taking Adderall.  R. 180.  In January 2002, Mr. Ray began to use a CPAP machine at home, but despite improvements, his drowsiness continued.  R. 176.[2]

In March 2002, the clinic lowered his Adderall prescription to a "wean" dose of four 20 mg tablets per day.  R. 174.  Mr. Ray continued taking six tablets per day so that he routinely finished his Adderall by the twentieth day of the month and slept for the remaining ten days until he could refill his prescription.  R. 216.  At his second hearing in September 2003, Mr. Ray also testified that he used over-

---

[1] GAF stands for Global Assessment Functioning.  It is a mental health rating that estimates a person's psychological, social, and occupational capacities. American Psychological Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. Text Revision 2000).  GAF 61-70 indicates "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., truancy or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.* at 34.

[2] A Continuous Positive Air Pressure (CPAP) machine builds air pressure in the throat, preventing collapse of the air passage when breathing.  People with sleep apnea use CPAP machines when sleeping to prevent repetitive waking.

the-counter Ephedrine despite potential health risks and began to take more Concerta than prescribed to treat his sleepiness. R. 310-11.[3]

In July 2002, Mr. Ray's treating physician Dr. Abbert completed a psychiatric evaluation of Mr. Ray and observed that he was alert with adequate memory, related well, was easy going, and had no trouble being around people. R. 209. Dr. Abbert diagnosed Mr. Ray with major depression and assigned him a GAF score of 40-50. *Id.*[4] Based on Mr. Ray's subjective self-assessments, Dr. Abbert's impressions included narcolepsy manifested by frequent sleeping. R. 208-09. Dr. Abbert recommended maintaining Mr. Ray on six tablets of 20 mg of Adderall per day, although the record is unclear whether and at what dosage Adderall might have been prescribed after July 2002. R. 209.

In June 2003, after a year of observing Mr. Ray, Dr. Abbert completed a statement of medical condition for the Food Stamp and Temporary Assistance for Needy Families Program and stated that Mr. Ray's diagnoses were narcolepsy and major depressive disorder. R. 271. Dr. Abbert stated: "in spite of high [dosages]

---

[3]Methylphenidate HCI, marketed as Concerta, is a mild central nervous system stimulant used to treat Attention Deficit Hyperactivity Disorder and is addictive when used in excessive doses over long periods. *Physician's Desk Reference* 1927, 1929 (59th ed. 2005)

[4]GAF 41-50 indicates: "Serious symptoms (suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep job)." American Psychological Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (4th ed. Text Revision 2000).

of stimulant, [he] tends to suddenly fall . . . [asleep and is a] danger to self and others."  Dr. Abbert also stated:  "The individual is totally unable to work."  *Id.*

Mr. Ray continued to have difficulty staying awake despite medications, although the duration and severity of the problem were unclear due to contradictory medical reports and lack of documentation regarding mitigating effects of medication.

The state agency had several physicians and psychologists assess Mr. Ray's ability to perform work-related tasks.  In February 2001, Dr. Corcoran reviewed Mr. Ray's medical record and opined that Mr. Ray could stand or walk for at least two hours and sit for six hours in an eight-hour work day.  R. 74.  Dr. Corcoran also recommended that Mr. Ray avoid driving and working around hazards.  R. 75, 77.  In July 2001, Dr. Gaffy affirmed Dr. Corcoran's assessment.  R. 80.  State agency psychologist Dr. Shipley also reviewed the evidence in July 2001 and opined that Mr. Ray did not have a severe mental impairment.  R. 82.

In June 2003, Dr. Kim examined Mr. Ray and reviewed his medical record.  R. 64.  Dr. Kim opined that Mr. Ray's symptoms signaled sleep apnea rather than narcolepsy.  He observed that Mr. Ray had a normal gait, was steady standing, and appeared comfortable in a seated position.  R. 65, 68.  In addition, Dr. Kim estimated that Mr. Ray should be able to work eight hours per day in a seated

position with occasional standing or walking, and that he should avoid prolonged driving and unprotected heights because of his sleepiness. R. 69, 71-72.

Mr. Ray's hearing took place before ALJ Albert Velasquez on September 29, 2003. The ALJ issued his decision denying benefits on November 20, 2003, finding that Mr. Ray retained the residual functional capacity to perform light work that is simple and repetitive in nature, with only superficial social interaction with others and with restrictions on operating machinery. R. 23. Based on these limitations, a vocational expert testified that a significant number of jobs existed in the national economy for such work. R. 324-25. Because the Appeals Council denied further review of the ALJ's decision, this decision is treated as the final decision of the Commissioner. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). This court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

*The Statutory Framework for Determining Disability*

To be eligible for disability insurance benefits or supplemental security income, a claimant must demonstrate an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d) and 1382c(a)(3)(A). This showing is presumed if a claimant's impairments meet or equal any impairment listed in Part 404 Appendix 1, Subpart

P of the implementing regulations and if the duration requirement is met. 20 C.F.R. § 404.1520(d). Otherwise, a claimant can establish disability only if his impairments are of such severity that he is unable to perform both work that he has previously performed and any other substantial work available in the national economy. 20 C.F.R. § 404.1520(f) and (g).

This eligibility standard is stringent. The Social Security Act does not contemplate degrees of disability and does not allow for an award based on a partial disability. *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985). The Act provides important assistance for some of the most disadvantaged members of the American society. But before tax dollars – including tax dollars paid by others who work despite serious and painful impairments – are available as disability benefits, it must be clear that the claimant has an impairment severe enough to prevent him from performing virtually any kind of work. Under the statutory standard, these benefits are available only as a matter of nearly last resort.

The implementing regulations for the Social Security Act provide the familiar five-step process to evaluate disability. See 20 C.F.R. § 404.1520(a)(4). The steps are:

(1)  Is the claimant currently employed? If so, he is not disabled.

(2)  If not, does the claimant have a severe impairment or combination of impairments? If not, he is not disabled.

(3)  If so, does the impairment meet or equal an impairment listed in the regulations? If so, the claimant is disabled.

  (4)  If not, can the claimant do his past relevant work?  If so, he is not disabled.

  (5)  If not, can the claimant perform other work in the national economy?  If so, he is not disabled.  If not, he is disabled.

When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

### *Standard of Review*

If the Commissioner's decision is supported by substantial evidence, it must be upheld by a reviewing court.  42 U.S.C. § 405(g); *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgments for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Luna*, 22 F.3d at 689.  The court must examine the evidence that favors the claimant as well as the evidence that supports the Commissioner's conclusion.  *Zurawski*, 245 F.3d at 888.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict.  *Binion v.*

*Chater*, 108 F.3d 780, 782 (7th Cir. 1997). A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or if the ALJ based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).

*Discussion*

Applying the five-step evaluation process, Mr. Ray satisfied step one since he was not currently working. He satisfied step two because the medical evidence supported a finding of severe impairments for obesity, obstructive sleep apnea, and possible narcolepsy. The ALJ found that Mr. Ray failed to meet the requirements for step three because his impairments did not meet nor equal an impairment listed in Appendix 1, Subpart P of the regulations. Mr. Ray met the requirements for step four because he was incapable of performing his past work as a saw operator, press operator or heavy equipment operator. However, the ALJ concluded that Mr. Ray did not satisfy step five because his residual functional capacity allowed him to perform other work that exists in significant numbers in the national economy. R. 23. The ALJ therefore found him not disabled under the Social Security Act. R. 24.

On judicial review, Mr. Ray advances four principal arguments: (1) the ALJ erred in not finding that Mr. Ray's depression was a "severe impairment" at step two; (2) the ALJ did not give proper weight to the opinion of the treating physician;

(3) the ALJ erred in his credibility determination; and (4) the ALJ's residual functional capacity determination was not supported by substantial evidence.

I.      *Depression as a Severe Impairment*

Mr. Ray claims that the ALJ erred in determining that his depression was not a severe impairment at step two. Mr. Ray reasons that because the ALJ included mental impairment limitations in determining his residual functional capacity in step five, the mental impairment in question must therefore meet the requirements for "severe impairment" at step two.

While a claimant's severe impairment must be taken into consideration in assessing his residual functional capacity, it does not follow that any impairment limiting one's functional capacity is "severe." Under the regulations, once a claimant is found to have any "severe impairment" that meets step-two requirements, "we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity." 20 C.F.R. § 404.1545(e). The ALJ considered those effects at step five, so the ALJ did not err by not finding Mr. Ray's depression to be "severe" at step two.

II.     *Credibility Determination*

Mr. Ray argues that the ALJ erred in discrediting his claim that he could stay awake for only two to three hours per day at prescribed levels of medication.

R. 285. Mr. Ray supports his claim with medical observations and reports of his subjective complaints documented by his health care providers and the opinion of his treating physician, Dr. Abbert. R. 175, 208-09, 271. In addition, Mr. Ray claims that the ALJ erred in assessing his daily life activities in making the credibility determination.

Ordinarily, because an ALJ is in a better position than a reviewing court to assess a claimant's credibility, an ALJ's credibility finding is entitled to deference and will not be disturbed unless "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *Diaz*, 55 F.3d at 308 (7th Cir. 1995). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities in the record. See *Knight v. Chater*, 55 F.3d 309, 313-15 (7th Cir. 1995) (affirming the ALJ's denial of disability benefits based in part on the ALJ's credibility determination); see also *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (plainly stating the proposition that the ALJ has the responsibility to resolve ambiguities in the record).

The ALJ can discount subjective complaints that are inconsistent with the evidence as a whole, but cannot discount such complaints merely because they are not supported by objective medical evidence. *Knight,* 55 F.3d at 314, citing 20 C.F.R. § 404.1529(c)(3) ("The absence of objective medical evidence is just one factor to be considered along with: (a) the claimant's daily activities; (b) the location, duration, frequency and intensity of pain; (c) precipitating and

aggravating factors; (d) type, dosage, effectiveness and side effects of medication; (e) treatment other than medication; (f) any measures the claimant has used to relieve the pain or other symptoms; and, (g) functional limitations and restrictions."). Here, the court will not disturb the ALJ's credibility finding because it is supported by substantial evidence and is not patently wrong.

The ALJ found that Mr. Ray's allegations concerning the frequency and severity of his impairments were not fully credible because they were "not reasonably consistent with the objective medical evidence or other evidence of record." R. 18. In making the credibility determination, the ALJ evaluated Mr. Ray's claim according to the criteria set forth at 20 C.F.R. §§ 404.1529, 416.929, and SSR 96-7p.

A major factor in the ALJ's credibility determination was Mr. Ray's continued employment until April 2000, several years after his claimed onset of narcolepsy and several months after he was diagnosed with sleep apnea in 1999. "This evidence draws into question the reliability of the claimant's allegations that he is unable to work due to his symptoms." R. 18. The ALJ also took into account the medications and treatment that Mr. Ray received for his problems. R. 17. Mr. Ray claims that during the period of alleged disability, he was unable to stay awake for eight hours even by taking medications at the prescribed levels. With 120 mg of Adderall per day, however, Mr. Ray testified he could stay awake until 8:00 p.m. R. 284. While Mr. Ray had a prescription for only 80 mg per day

between March and July 2002, it is unclear whether Mr. Ray continued to have a prescription for Adderall after July 2002, and if so, at what dosage.

The ambiguity regarding Mr. Ray's prescribed treatment and its mitigating effects during the period of contested disability makes it difficult to substantiate Mr. Ray's claimed duration, frequency, duration, or intensity of his symptoms, especially since Mr. Ray acknowledges that for at least some length of time, he was able to function normally at the prescribed dose of Adderall.  The ALJ is responsible for resolving ambiguities in the record.  He acted within his discretion when he discounted evidence that was internally inconsistent or inconsistent with other evidence on record.  20 C.F.R. § 404.1527(c)(2); *Knight*, 55 F.3d at 314; *Luna*, 22 F.3d at 690-91.

The ALJ also cited the internal inconsistency of Mr. Ray's testimony regarding his activities of daily living.  At the first hearing, Mr. Ray testified that he microwaved food for his children, but at the second administrative hearing, Mr. Ray stated that he no longer cooked any food. R. 18.  An ALJ may discount a claimant's subjective assessments where they are internally inconsistent or inconsistent with other objective medical evidence in the record.  SSR 96-7p ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."); *Knight*, 55 F.3d at 314, ("An ALJ may discount subjective complaints of pain that are inconsistent with the evidence as a whole.").  Accordingly, the record does not

indicate that the ALJ's credibility determination is patently wrong. Because the ALJ's decision is supported by substantial evidence, this court will not disturb the ALJ's credibility determination.

III.     *Treating Physician's Opinion*

Mr. Ray contends that, because Dr. Abbert's medical opinions are based on monthly observation over the course of a year and are supported by the evidence in the record, the ALJ erred in discounting his opinion that Mr. Ray was unable to work.

A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence on record. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); 20 C.F.R. § 416.927(d)(2). Conversely, an ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician, or when the treating physician's opinion is internally inconsistent, as long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability." *Skarbek*, 390 F.3d at 503, citing *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000).

Dr. Abbert first began seeing Mr. Ray in July 2002, when he gave Mr. Ray a psychiatric evaluation and opined that he had narcolepsy, major depressive disorder (moderate), and a GAF score of 40/50. R. 209. In June 2003, Dr. Abbert

completed a statement of medical condition for Mr. Ray's application for Food Stamp and Temporary Assistance for Needy Families and stated that in spite of high dosages of stimulant, Mr. Ray tended to fall asleep suddenly and hence was a danger to himself and others and was totally unable to work.  R. 271.

Substantial evidence supports the ALJ's conclusions that Dr. Abbert's opinions were not supported by the objective medical evidence and were inconsistent with other evidence.  R. 21.  The ALJ noted that Mr. Ray admitted that medication controlled his sleepiness because he was able to stay awake until 8:00 p.m. with Adderall.  *Id.*  In addition, the ALJ observed that no other treating physician ever concluded that Mr. Ray was disabled due to his narcolepsy, and that Dr. Abbert's opinions were based on Mr. Ray's subjective reports rather than objective medical evidence.  *Id.*

The ALJ accorded greater weight to the findings of examining state physicians and psychologists that contradicted Dr. Abbert's opinions.  In January 2001, Dr. Bangura's exam of Mr. Ray did not reveal any remarkable findings other than severe sleep apnea syndrome.  R. 146-50.  Dr. Jarmon evaluated Mr. Ray in May 2001 and assigned a GAF score of 60-65.  R. 98-100.  In June 2003, Dr. Kim examined Mr. Ray and concluded that his symptoms were more consistent with sleep apnea than narcolepsy.  R. 68-69.  Dr. Kim also concluded that Mr. Ray could stand and walk for up to four hours at a time and up to eight hours per day.  R. 71.

Dr. Abbert's opinions are also inconsistent with the opinions of several non-examining state agency medical consultants. In February 2001, Dr. Corcoran opined that Mr. Ray could stand or walk for at least two hours in an eight-hour work day and sit for about six hours in an eight-hour work day. R. 74. State psychologist Dr. Shipley reviewed Mr. Ray's record in July 2001 and concluded that he did not have a severe mental impairment. R. 82. The ALJ was entitled to rely on these sources was appropriate. 20 C.F.R. § 416.927(f)(2)(i).

Substantial evidence supports the ALJ's determination that Dr. Abbert's opinion was inconsistent with the other evidence on record. Accordingly, the ALJ acted within his discretion in not giving that opinion controlling weight. 20 C.F.R. § 416.927(c)(2).

IV.   *Residual Functional Capacity*

Mr. Ray next argues the ALJ improperly determined his residual functional capacity. Mr. Ray contends that the ALJ did not clearly explain which mental impairments he considered in limiting him to simple and repetitive work and avoiding interaction with others. Mr. Ray also contends that the ALJ did not adequately consider his difficulties in staying awake.

The ALJ determined that Mr. Ray could perform light work that allowed him to alternate between sitting and standing positions, and that required no more than occasional bending, squatting, or climbing of stairs or ramps; and no

kneeling, crawling or climbing of ropes, ladders, or scaffolds.  R. 20.  In addition, the ALJ limited Mr. Ray to simple and repetitive work with no more than superficial interaction with people.

Mr. Ray's contention that the ALJ did not explain which impairments he considered in limiting Mr. Ray to simple and repetitive work and avoiding interaction with others is unfounded.  The ALJ specifically stated that Mr. Ray's concentration problems and drowsiness were considered, to the extent he found them credible, in limiting Mr. Ray to simple and repetitive work.  *Id.*  The ALJ also stated that Mr. Ray's moderate difficulties in social functioning were considered in limiting him to no more than superficial interaction with others.  *Id.*

Similarly, Mr. Ray's claim that the ALJ erred in determining that his problems with sleepiness did not preclude him from work likewise lacks merit.  The ALJ supported his residual functional capacity determination with a logical bridge to the medical evidence in the record.  In June 2003, Dr. Kim examined Mr. Ray and concluded that he was capable of sitting eight hours during an eight-hour work day.  R. 71.  The ALJ assigned limitations that were more restrictive than Dr. Kim's assessment because the ALJ assumed that Mr. Ray had narcolepsy and considered Dr. Chintalapudi's recommendation (that Mr. Ray be cautious with operating dangerous machinery) given after performing a sleep study in 1999.  R. 152.  The ALJ also considered Mr. Ray's subjective descriptions of his symptoms

-18-

to the extent he found them credible and evaluated him according to the criteria set forth at 20 C.F.R. §§ 404.1529, 416.929, and SSR 96-7p.

Mr. Ray also claims that his sleepiness has never been fully treated at the prescribed level of medication. However, a person's residual functional capacity is not determined by whether the impairments are fully treated. Even if a claimant's impairments are treated only partially, he will not be found disabled if he retains the functional capacity for gainful employment. See *Schmidt v. Barnhart*, 395 F.3d 737, 745 (7th Cir. 2005). In addition, the ALJ's credibility determination undermines Mr. Ray's claim that he was unable to maintain any gainful employment even at the prescribed levels of medication. Mr. Ray admitted that for several months during the contested period of disability, Adderall helped him to function normally and to stay awake until 8:00 p.m.

For the foregoing reasons, the ALJ's determination of Mr. Ray's residual functional capacity is supported by substantial objective medical evidence on record.

*Conclusion*

The ALJ in this case found that Mr. Ray's impairments did not establish disability under the law. The ALJ's decision was consistent with the law and supported by substantial evidence. The Commissioner's decision is affirmed. Final judgment will be entered accordingly.

So ordered.

Date: May 4, 2005

*David F. Hamilton*
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

James F. Roth
Jim@jimrothlaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov